NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2025 CJ 0278

STATE OF LOUISIANA IN THE
INTEREST OF N.J., JR., N.J., AND A.J.

Judgment Rendered: SEP 1 9 2025

* * * * * * * *

Appealed from the
23rd Judicial District Court
In and for the Parish of Assumption
State of Louisiana
Docket No. 4757, Division D

The Honorable Steven Tureau, Judge Presiding

* * * * * * * *

Douglas Lee Harville
Shreveport, Louisiana

Counsel for Appellants
M.C., mother of minor children
N.J., Sr., father of minor children


Mary R. Mustaller McMillan
New Orleans, Louisiana

Counsel for Appellees
N.J., Jr., N.J. and A.J., minor
children


Linda A. Mitchell
Jarrette J. Tuircuit
Houma, Louisiana

Counsel for Appellee
Department of Children and
Family Services


* * * * * * * *

BEFORE: THERIOT, PENZATO, AND BALFOUR, JJ.

Penzato, J, concurs

**THERIOT, J.**

In this case, N.J., Sr. and M.C.[1] appeal a trial court judgment that terminated their parental rights to three of their children, N.J., Jr., N.J., and A.J.,[2] and certified the children for adoption. For the reasons set forth herein, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On Thursday, May 5, 2022, the Assumption Parish Sheriff's Office was called out to a home in Labadieville regarding a protective order violation by M.C.[3] Upon arrival, the Sheriff's Office called the Department of Children and Family Services ("DCFS") due to the conditions of the home and of the seven children[4] in the home. DCFS investigators responded immediately and found the home to be in deplorable condition and the children covered in bug bites and appearing not to have been bathed or changed in quite some time. The affidavit of one of the DCFS investigators contained the following observations:

> Four of the [seven] children are there without their parents and it is unknown where the parent is.[5] They are sleeping in feces and the children looked like they haven't been bathed in probably weeks. There are no beds in the home. There are flies everywhere, almost every window in the home is broken, no food in the home, and feces (animal and human) all over the place. One child's back is covered in feces and urine. [T]hese are small children, the oldest child may be 3-4-year[s]-

---

[1] To ensure the confidentiality of the children, all parties shall be referred to by their initials. See Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2.

[2] It is unclear from the record before us exactly how many children N.J., Sr. and M.C. have. M.C. testified that she had a total of seven children: one child was deceased, her parental rights had been terminated to three of the children due to her failure to work her case plan, and the remaining three children are the subject of this termination proceeding. N.J., Sr. reported that he had nine children, all of whom have been removed from his custody by the states of Arkansas, Indiana, and Louisiana.

[3] According to M.C.'s testimony, she had served five days in jail on a domestic violence charge involving N.J., Sr., and was released from jail in the early morning hours of May 5, 2022. Upon her release, she was told that she could go home, so she returned to the Labadieville home she and N.J., Sr. had been living in, which violated a protective order obtained by N.J., Sr. against her.

[4] Only two of the children in the home on that date, N.J., Jr. and N.J., are N.J, Sr. and M.C.'s children. A.J. was not yet born at this time.

[5] According to N.J., Sr., four of the children in the home were left in the "custody" of M.C. by their mother, who just dropped them off and had not returned to pick up the children for over a month. N.J., Sr. said that he does not have a way to contact either of the parents of those four children.

2

old. There is one window AC unit for the entire home. The children are covered in mosquito bites[.] The oldest female child . . . has severe bruising on her left leg that looks like she was either whipped or like an adult grabbed her by the leg and pulled her. The oldest male child has bruising on his head.

\*\*\*

[N.J., Jr. and N.J.] were observed to be clean in appearance. [N.J.] was observed sitting in a baby bouncer in front of a fan blowing from a window into the home. She was observed to have small red bumps covering her legs, arms, and face. Other children in the home were observed with the same red bumps which [were] reported ... to be mosquito bites. [N.J., Jr.] was observed to be free of the red bumps but . . . [had] a large scratch on his forehead[,] which other children in the home disclosed [came] from the household pet, Rocky, a large dog.

The home was observed to be in deplorable [condition]. The floor boards were weak and moved when you pushed on them, walkways had long planks of wood to cover the weakened boards. There were multiple broken and splintered wooden doors within the home; also the paneled walls were splintered. Multiple holes were observed in the walls throughout the home. The kitchen presented to have dirty dishes and old food on the countertops, in the sinks[,] and on top of the washer and dryer. The master bedroom contained cluttered items along all 4 walls that stretched to the middle of the floor. The master bathroom door was shattered and stuck closed[,] which didn't allow for the children to open it. When opened, the bathroom was observed with trash, clutter[,] and clothing throughout. The floor boards were loose or missing with some located in the bathtub. The commode was functioning but had not been flushed as the water was brownish-yellow[,] which appeared to be urine. The water reportedly needed to be turned on from the [pipe] revealed through a missing panel on the bedroom side of the wall. The secondary bathroom was observed to have a door laying across the entirety of the bathroom as if it had been kicked in, the commode was duct taped shut and the bathroom was reportedly inoperable. There were multiple windows broken throughout the home, there were clothes, trash, and clutter in all corners in each room of the home. The residence was infested with houseflies[,] which were swarming the infant children and the kitchen countertops. There is one window AC unit for the entire home. The living room presented to have two (2) baby beds, a pack-n-play, and various children's toys. A back bedroom also contained two (2) pack-n-plays, a crib[,] which did not appear to be in use, a toddler bed without a mattress, and a kenneled dog.

Melissa Hatcher, who was the mother of one of the children in the Labadieville home, told DCFS investigators that she had been left alone to care for the seven children and multiple animals in the home when M.C. had gone to jail for five days. Mrs. Hatcher explained that while M.C. was in jail, the home got "messy,"

but she and M.C. had been trying to clean the home since M.C. returned earlier that day.

N.J., Sr. was located and advised DCFS that he had not been to the home since Sunday (May 1, 2022), except for one hour on Tuesday (May 3, 2022) and two hours on Wednesday (May 4, 2022), but that the home does not typically look this way and had only reached this condition during the time period he was away. He claimed that he takes care of all of the children in the home and that he bathes them regularly and feeds them. Although he admitted that the conditions of the home were not appropriate for children, he explained that he had not removed his two children from the home because he intends to clean it.

Due to the conditions of the home and concerns for the physical health of the children, DCFS requested and was granted custody of N.J., Jr. and N.J. on May 5, 2022. A Continued Custody Hearing was held on May 9, 2022. N.J., Sr. was present in court with his court-appointed attorney and stipulated to the children remaining in the custody of DCFS without admitting to the allegations. M.C. did not appear in court; however, her court-appointed attorney was present and entered the same stipulation on her behalf. The trial court found that it was in the children's best interests to remain in DCFS custody and ordered that they remain in the custody of DCFS.

A child in need of care ("CINC") petition was filed on June 9, 2022, in which DCFS alleged:

> [N.J., Sr. and M.C.] demonstrated diminished caretaker capacities due to the condition of the home being assessed as unsafe and unsanitary based on the deplorable conditions; and neither parent sought to move the children to a safer and more stable environment upon recognizing the declining condition of the home. Based on the children's age and inability to self-protect or provide reasonable supervision for themselves and/or others, the children were found to be placed in a situation beyond their ability to cope. Therefore, the presented diminished caretaker capacities present safety threats and concerns in reference to the safety and well-being of the minor children.

DCFS also noted that both N.J., Jr. and N.J. had been the subject of previous DCFS cases at the time of their births in 2020 and 2021 due to "Neglect/Drug Affected Newborn." In each case, the allegations were deemed valid and the family was referred to DCFS – Family Services Unit for monitoring in recommended services; however, both cases were later closed when DCFS was unable to locate the family.

On June 10, 2022, M.C. was charged with violation of a protective order, and on June 14, 2022, she was charged with five counts of cruelty to juveniles with force/violence. M.C. was convicted of cruelty to juveniles and remained incarcerated from June 10, 2022 until February 20, 2023.

An Answer Hearing for the CINC petition was held via Zoom on June 16, 2022. Neither N.J., Sr. nor M.C. appeared at the hearing, but their attorneys entered denials on their behalf, and an Adjudication Hearing was set for July 6, 2022. N.J., Sr. appeared at the Adjudication Hearing on July 6, 2022 with his counsel. M.C. was served with notice but did not appear at the hearing; however, her court-appointed attorney was present. Without admitting to the allegations of the CINC petition, a stipulation was entered by or on behalf of N.J., Sr. and M.C. that the children were in need of care. The trial court found that DCFS proved the allegations in the CINC petition by a preponderance of the evidence and further found the children to be in need of care. Custody of N.J., Jr. and N.J. was maintained with DCFS.

A Disposition Hearing was held on August 2, 2022. N.J., Sr. was present, along with his court-appointed attorney. M.C. did not appear at the hearing, but her court-appointed attorney was present. N.J., Sr. agreed to the case plan presented to the trial court by DCFS, and the trial court ordered the children to remain in DCFS custody and ordered N.J., Sr. and M.C. to actively participate in the services provided by DCFS and to demonstrate progress toward achieving the case plan objectives.

N.J., Sr. and M.C. had another child, A.J., who was born on August 26, 2022. DCFS became aware of A.J.'s birth on September 1, 2022, when it received a report of Neglect/Shelter Inadequate as to A.J., indicating that N.J., Sr. and A.J.[6] were living in poor conditions at a home in Thibodaux, Louisiana.[7] DCFS noted that in addition to the poor condition of the interior and exterior of the home, there was no baby formula in the home at the time of their visit. DCFS requested custody of A.J. on October 6, 2022, noting:

> [N.J., Sr.] demonstrated diminished caretaker capacities due to having history with the agency of periodically or continuously fail[ing] to provide shelter which is minimally safe, healthy, sanitary and/or which protects the child from the weather or elements. While assessing the home it was found that the living conditions present a serious and immediate health or safety hazard because of environmental hazards in the home. Although [N.J., Sr.] made a plan for [A.J.] to be in the care of a family acquaintance, the child was moved from home to home[,] having been in the care of five (5) different individuals . . . between September 13th and September 23rd 2022. Therefore, the presented diminished caretaker capacities, the child's age and inability to self-protect present safety threats and concerns in reference to the safety and well-being of the minor child.

The trial court found that reasonable grounds existed to believe that A.J. was in need of care and that emergency removal was necessary to secure her protection and was in her best interest. Accordingly, custody of A.J. was granted to DCFS, with liberal visitation afforded to N.J., Sr.

A Review Hearing was held on October 6, 2022 as to N.J., Jr. and N.J. Neither N.J., Sr. nor M.C. attended the hearing, although notice of the date, time, and place of the hearing and their right to attend was properly served; however, their court-appointed attorneys were present. The trial court ordered the custody of the children to be maintained with DCFS, approved the case plan submitted by DCFS, and

---

[6] M.C. was incarcerated at this time at the Louisiana Correctional Institute for Women in Zachary, Louisiana.

[7] DCFS proceedings involving A.J. were initiated in the 17th JDC, but the matter was eventually transferred and consolidated with the CINC proceedings in the 23rd JDC involving N.J., Jr. and N.J. on March 27, 2023.

6

ordered all parties to comply with the requirements of the case plan, including their duty to keep DCFS apprised of their current address and to correct the conditions requiring the children to be in care. The trial court's order further informed the parties that a petition to terminate their parental rights may be filed based upon their failure to comply with the requirements of the case plan, failure to make measurable progress toward achieving case plan goals or to correct the conditions requiring the children to be in care, or on any other ground authorized by La. Ch.C. art. 1015.

On October 18, 2022, a CINC petition was filed as to A.J.[8] An Answer Hearing for the CINC petition was held on October 27, 2022. N.J., Sr. was present, along with his court-appointed attorney. M.C. was not present at the hearing, but was represented by a court-appointed attorney. Both parties denied the allegations of the CINC petition.

DCFS provided a report to the trial court prior to the hearing on the CINC petition regarding A.J. In this November 16, 2022 report, DCFS noted that N.J., Sr. and M.C. have prior history with DCFS cases regarding all of their children. Regarding the current status of N.J., Sr. and M.C.'s case plan progress, DCFS noted:

> [N.J., Sr. And M.C.] have not shown the ability to provide safe and stable housing at this time.
>
> [N.J., Sr.] resides . . . in Thibodaux. The home belongs to his friend, Mr. Herbert Mitchell. Mr. Mitchell's home is three bedrooms and two bathrooms. [N.J., Sr.] has reported to [DCFS] that he plans to continue living in this residence until he can save up to afford his own[.]
>
> [N.J., Sr.] has missed 7 appointments for his mental health assessment and substance abuse assessment. [N.J., Sr.'s] hair drug screen on 8/4/22 was positive for amphetamines, methamphetamines, and marijuana. His hair drug screen on 10/19/22 was positive for methamphetamines, amphetamines, cocaine, and marijuana.
>
> [M.C. and N.J., Sr.] still remain in contact with each other and have failed to address the domestic violence concerns identified by [DCFS].

---

[8] Although filed in the 17th JDC, this proceeding was later transferred and consolidated with the CINC proceedings involving N.J., Jr. and N.J. on March 27, 2023.

[M.C.] is incarcerated at Concordia Correctional Institute in Ferriday, La. She was charged with violation of a protective order on 6/10/22 and 5 counts of cruelty to juveniles with force/violence on 6/14/22. Her expected release date is February 2023. [M.C.] has not been able to complete a mental health or substance abuse assessment. [M.C.] was referred to Nicholls Resource Center on 6/7/22, but due to being incarcerated, she is unable to complete the program.

[M.C.] has not provided any documentation of completing anger management or batterer's intervention courses while incarcerated.

DCFS further noted that M.C. had been unable to attend visitation with A.J. due to her incarceration, as the Concordia Parish Jail does not allow visitation for inmates, and N.J., Sr. had not yet attended visitation with A.J. DCFS recommended that A.J. remain in the custody of DCFS, noting:

[N.J., Sr.] has been keeping in contact with [DCFS], but he has yet to address the concerns of domestic violence, housing, and substance abuse made by [DCFS]. [M.C.] has not been able to address [DCFS's] concerns at this time due to her incarceration. [M.C. and N.J., Sr.] have both expressed to [DCFS] their desire for [A.J.] to be home, however, the family has not been compliant with services at this time.

DCFS assessed both N.J., Sr. and M.C.'s risk level as "Very High," and advised that in order to achieve reunification, N.J., Sr. and M.C. "should remedy the identified safety threats that caused [A.J.] to enter into care by showing behavioral changes that align with the services provided to the family for a successful reunification."

An Adjudication Hearing for A.J. was held on November 30, 2022. N.J., Sr. was not present, but was represented by his court-appointed attorney. M.C. was present via Zoom from the Concordia Parish Jail and was represented by a court-appointed attorney. A.J. was adjudicated a child in need of care and was maintained in the custody of DCFS, and a case plan was approved for all parties. The trial court informed the parents of their obligations to cooperate with DCFS; comply with the requirements of the case plan, including their duty to keep DCFS apprised of their current address; support their children, including their obligation to contribute to the care and treatment of their children; and to correct the conditions requiring the

children to be in care. The trial court's order further informed the parties that a petition to terminate their parental rights may be filed based upon their failure to comply with the requirements of the case plan, failure to make measurable progress toward achieving case plan goals and to correct the conditions requiring the children to be in care, or on any other ground authorized by La. Ch.C. art. 1015.

A case report dated February 2, 2023 was prepared by DCFS and presented to the trial court regarding A.J. In this report, DCFS again noted that N.J., Sr. and M.C.[9] were unable, unwilling, or did not meet A.J.'s basic needs for necessary food, clothing, shelter, medical, or mental health. According to the report, N.J., Sr. and M.C. had not yet secured safe and stable housing. DCFS further noted that N.J., Sr. and M.C. were unable, unwilling, or did not provide necessary supervision, protection, or care. DCFS opined that this failure might be attributable to physical or mental health issues, substance abuse, domestic violence, cognitive or developmental deficits, or poor judgment. N.J., Sr. had not addressed his substance abuse and had not produced a negative drug screen, nor had he participated in trauma counseling to address his mental health. M.C. had not addressed the concerns for domestic violence in the home. DCFS again rated both parents' risk levels as Very High and recommended that A.J. remain in the custody of DCFS.

A case review hearing was held on April 4, 2023 regarding N.J., Jr., N.J., and A.J. Both N.J., Sr. and M.C. were present in court for the hearing.

On June 19, 2023, DCFS prepared a report for the trial court regarding N.J., Jr., N.J., and A.J. The report noted that N.J., Sr. and M.C. had not secured safe and stable housing, but N.J., Sr. was on a waiting list for Section 8 housing. In the meantime, M.C. and N.J., Sr. were living together in Napoleonville in a home without electricity. Neither parent had addressed their substance abuse, N.J., Sr. had

_____

[9] M.C. remained incarcerated at this time.

not participated in trauma counseling to address his mental health, and M.C. had not addressed the concerns for domestic violence in the home. The report noted that M.C. completed an anger management course while incarcerated, and following her release, she completed her intake for Thibodaux Day Reporting Center, a facility that provides former inmates with tools necessary to become productive citizens. M.C. was assigned a caseworker at the Day Reporting Center and enrolled in parenting and batterers' intervention programs, as well as a second anger management course required for her parole. However, M.C. was unsuccessfully discharged from the program due to non-compliance (she reached her limit with transportation violations, had increasingly irate behaviors, and cancelled mandatory classes) and had not provided DCFS with documentation of completing parenting, mental health, substance abuse, or batterers' intervention programs with any other providers. N.J., Sr. attended a mental health assessment, where he was diagnosed with bipolar disorder and ADHD and prescribed medication, but thereafter failed to show up for his medication management and therapy appointment; he was referred to New Start Recovery, completed an intake, and was accepted into the Intensive Outpatient Program, but declined the services due to transportation issues; he attended a substance abuse assessment and received a recommendation for outpatient substance abuse treatment, random drug screens, and attendance at a minimum of two AA/NA meetings a week in the community; and he was referred to a parenting program and assigned a caseworker, but was later discharged from the program due to multiple missed appointments. N.J., Sr. attended 5 out of 11 scheduled drug screens: on 8/4/22, he tested positive for methamphetamines, amphetamines, cocaine, and marijuana; on 10/12/22, he tested positive for methamphetamines, amphetamines, cocaine, and marijuana; on 1/19/23, his drug screen was positive for methamphetamines, amphetamines, and marijuana; on 2/3/23, his urine drug screen was positive for marijuana, although his hair drug

10

screen was negative; and on 3/24/23, his drug screen was negative. N.J., Sr. did not attend his drug screen on 4/27/23. DCFS noted that while N.J., Sr. and M.C. expressed a desire to regain custody of their children, they did not follow through with services, and DCFS recommended the goal of adoption for N.J., Jr., N.J., and A.J. DCFS noted that N.J., Sr. often began services before a court date and then did not follow through with them afterwards. DCFS further noted that M.C. had a history of abuse and neglect with the states of Louisiana and Arkansas and had not exhibited behavioral changes to resolve the issues that led to her children's removal. Finally, DCFS noted that neither party had addressed the domestic violence issues in the home.

A Case Review and Permanency Hearing was held on September 7, 2023. N.J., Sr. and M.C. did not attend the hearing, despite receiving notice. The trial court concluded that adoption was the most appropriate permanent plan for the children and was in their best interests.

On October 11, 2023, M.C. was arrested for forgery and identity theft, and she remained incarcerated at the time of the trial in this matter more than a year later.

On April 25, 2024, DCFS filed a petition for termination of parental rights and certification for adoption as to N.J., Jr., N.J., and A.J. DCFS asked that N.J., Sr. and M.C.'s rights be terminated pursuant to La. Ch.C. art. 1015(4) and (5), for abandonment of the children by failing to provide significant financial contributions to the children's care for a period in excess of six months and for failure to comply with their case plan for services.

A trial was held on the petition to terminate N.J., Sr. and M.C.'s parental rights on October 30, 2024. At the trial, DCFS filed the entire court record into evidence, and M.C. filed certificates of completion for a Domestic Violence Awareness course and a Substance Abuse Impact class into evidence. M.C., N.J., Sr., and Leteya Scott, DCFS's Child Welfare Supervisor who has supervised this case from its inception,

11

testified at the trial. After taking the matter under advisement, the trial court concluded that the State had met its burden of proving by clear and convincing evidence that termination of the parental rights of N.J., Sr. and M.C. is justified under La. Ch.C. art. 1015. The trial court further concluded that it was in the best interest of the children for the parental rights of N.J., Sr. and M.C. to be terminated so that the children may be placed in a stable and permanent home for adoption under La. Ch.C. art. 1039. Accordingly, the trial court terminated the parental rights of N.J., Sr. and M.C. to N.J., Jr., N.J., and A.J. Custody of the children was awarded to DCFS, and the children were certified for adoption.

N.J., Sr. and M.C. appealed, arguing that the trial court erred in terminating their parental rights because DCFS failed to prove by clear and convincing evidence that: (1) they had not substantially complied with their case plan; (2) there was no reasonable likelihood of compliance in the near future and DCFS had engaged in reasonable efforts to reunify them with the children; (3) any failure to provide parental contributions was not based on poverty or DCFS's failure to offer reasonable services to them; and (4) termination was in the children's best interests.

## DISCUSSION

Permanent termination of the legal relationship between natural parents and children is one of the most drastic actions the State can take against its citizens. *State in Interest of A.L.D.*, 2018-1271, p. 4 (La. 1/30/19), 263 So.3d 860, 863. The United States Supreme Court has declared that a natural parent's right to the care, custody, and management of their child is a fundamental liberty interest that "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous

12

relationships found in a home with proper parental care. *State ex rel. H.A.S.*, 2010-1529, p. 11 (La. 11/30/10), 52 So.3d 852, 859. In balancing those interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *State ex rel. H.A.S.*, 2010-1529 at pp. 11-12, 52 So.3d at 859. The primary concern of the courts and the State remains to determine and ensure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. *State in the Interest of A.L.D.*, 2018-1271 at p. 4, 263 So.3d at 863.

Louisiana Children's Code article 1004.2 provides that DCFS "*shall* file and pursue to judgment in the trial court a petition to terminate the parental rights of the parent or parents if the child has been in state custody for seventeen of the last twenty-two months, unless [DCFS] has documented in the case plan a compelling reason why filing is not in the best interest of the child." (emphasis added). At the time the termination petition was filed on April 25, 2024, N.J., Jr. and N.J. had been in DCFS custody for over 23 months, and A.J. had been in DCFS custody for over 18 months. Accordingly, DCFS was mandated by art. 1004.2 to pursue termination unless it had documented in the case plan a compelling reason why termination is not in the best interests of the children.

In addition to the mandatory provisions of La. Ch.C. art. 1004.2, La. Ch.C. art. 1004(D) provides that DCFS *may* petition for the termination of parental rights when any of the following apply:

> (1) The child has been subjected to abuse or neglect after the child is returned to the parent's care and custody while under department supervision, and termination is authorized by Article 1015(3)(j).

> (2) The parent's parental rights to one or more of the child's siblings have been terminated due to neglect or abuse and prior attempts to rehabilitate the parent have been unsuccessful, and termination is authorized by Article 1015(3)(k).

13

(3) The child has been abandoned and termination is authorized by Article 1015(4).

(4) The child has been placed in the custody of the state, and termination is authorized by Article 1015(5).

(5) The child is in foster care because the parent is incarcerated, and termination is authorized by Article 1015(6).

(6) The child is in foster care and, despite diligent efforts by the department to identify the child's father, the father's identity is unknown, and termination is authorized by Article 1015(8).

Louisiana Children's Code article 1015 sets forth the statutory grounds by which a court may involuntarily terminate the rights and privileges of a parent:

(1) Conviction of murder of the child's other parent.

(2) Unjustified intentional killing of the child's other parent.

(3) Misconduct of the parent toward this child or any other child of the parent or any other child which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:

    (a) Murder.

    (b) Unjustified intentional killing.

    (c) Aggravated crime against nature as defined by R.S. 14:89.1(A)(2).

    (d) Rape.

    (e) Sodomy.

    (f) Torture.

    (g) Starvation.

    (h) A felony that has resulted in serious bodily injury.

    (i) Abuse or neglect which is chronic, life-threatening, or results in gravely disabling physical or psychological injury or disfigurement.

    (j) Abuse or neglect after the child is returned to the parent's care and custody while under department supervision, when the child had previously been removed for his safety from the

14

parent pursuant to a disposition judgment in a child in need of care proceeding.

(k) The parent's parental rights to one or more of the child's siblings have been terminated due to neglect or abuse, prior attempts to rehabilitate the parent have been unsuccessful, and the court has determined pursuant to Article 672.1 that current attempts to reunite the family are not required.

(l) Sexual exploitation or abuse, which shall include but is not limited to acts which are prohibited by R.S. 14:43.1, 43.2, 46.3, 80, 81, 81.1, 81.2, 82.1(A)(2), 89, and 89.1.

(m) Human trafficking when sentenced pursuant to the provisions of R.S. 14:46.2(B)(2) or (3).

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

(6) The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the child's age and his need for a safe, stable, and permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.

15

(7) The relinquishment of an infant pursuant to Chapter 13 of Title XI of this Code.

(8) The child is in the custody of the department pursuant to a court order for at least one year, unless sooner permitted by the court, and the identity of the child's father remains unknown and all the following have occurred:

(a) In the course of investigating the case and providing services to the family, the department has been unable to learn the identity of the father.

(b) No party to the proceedings or the mother, if not a party, is able to provide a first and last name of a putative father or alias sufficient to provide a reasonable possibility of identification and location.

(c) The department has obtained all of the following:

(i) A certified copy of the child's birth certificate with no one indicated thereon as the father of the child, or the father listed has been determined not to be the biological father of the child.

(ii) A recent certificate from the putative father registry indicating that no person is listed or registered as the child's father.

(iii) A recent certificate from the clerk of court in the parish in which the child was born indicating that no acknowledgment with respect to this child has been recorded.

The State need only prove one statutory ground for termination under La. Ch.C. art. 1015, but must do so by clear and convincing evidence.[10] *State ex rel. J.A.*, 1999-2905, p. 9 (La. 1/12/00), 752 So.2d 806, 811; La. Ch.C. art. 1035(A). After a ground for termination is established, the court must then determine whether termination is in the child's best interest. *State ex rel. L.B. v. G.B.B.*, 2002-1715, p. 5 (La. 12/4/02), 831 So.2d 918, 922; see also La. Ch.C. art. 1037(B)(1).

The manifest error standard of review applies to a trial court's findings regarding whether parental rights should be involuntarily terminated. In applying

---

[10] "Clear and convincing" evidence requires more than a "preponderance," but less than "beyond a reasonable doubt." Under the clear and convincing standard, the existence of a disputed fact must be highly probable or much more probable than its nonexistence. *State in Int. of L.J.*, 2023-1357, p. 13 n.18 (La. App. 1 Cir. 12/26/24), 404 So.3d 956, 966 n.18.

the manifest error standard, an appellate court seeks to determine whether the record reflects the trial court was clearly wrong. *State ex rel. H.A.B.*, 2010-1111, p. 31-32 (La. 10/19/10), 49 So.3d 345, 368.

In the instant case, DCFS alleged that N.J., Sr. and M.C.'s parental rights should be terminated for the grounds set forth in La. Ch.C. art. 1015, including but not limited to 1015(4) (abandonment based on the failure to provide significant financial contributions for any period of six consecutive months) and 1015(5) (lack of substantial compliance with the case plan). In the judgment terminating their parental rights, the trial court found that both N.J., Sr. and M.C. failed to comply with their case plans and provide the children with the stability necessary for their well-being. The trial court further found that DCFS carried its burden of proving by clear and convincing evidence that termination of the parental rights of both N.J., Sr. and M.C. is justified under La. Ch.C. art. 1015 and that termination was in the children's best interests.

*Lack of substantial compliance with a case plan*

In their first assignment of error, N.J., Sr. and M.C. argue that the trial court erred in terminating their rights because DCFS failed to prove by clear and convincing evidence that they had not substantially complied with their case plans.

The case plan for M.C. required her to secure and maintain safe and stable housing and provide adequate food, clothing, shelter, and bed space for all of her children; pay monthly parental contributions of $25.00 per child while the children are in foster care; make herself available for home visits by the case manager; notify the caseworker within 24 hours of any changes such as address, phone number, individuals residing in the home, hospitalizations, and any involvement with law enforcement; sign a consent to release information with all service providers in order for the caseworker to obtain documentation on her compliance; complete a mental health assessment with a DCFS-approved provider and follow all recommendations

17

set forth by the provider; submit to random drug screens as directed by DCFS or the substance abuse provider; participate in and successfully complete parenting education and any other recommended programs; be actively present for all family team meetings, court hearings, and visits as they pertain to her children; complete a substance abuse assessment through a DCFS-approved provider and follow all recommendations set forth by the provider; self-enroll and actively participate in a DCFS-approved anger management program; and self-refer and actively participate in a DCFS-approved batterers' intervention program.

The case plan for N.J., Sr. required him to secure and maintain safe and stable housing and provide adequate food, clothing, shelter, and bed space for all of his children; pay monthly parental contributions of $25.00 per child while the children are in foster care; make himself available for home visits by the case manager; notify the caseworker within 24 hours of any changes such as address, phone number, individuals residing in the home, hospitalizations, and any involvement with law enforcement; sign a consent to release information with all service providers in order for the caseworker to obtain documentation on his compliance; complete a mental health assessment with a DCFS-approved provider and follow all recommendations set forth by the provider; submit to random drug screens as directed by DCFS or the substance abuse provider; participate in and successfully complete parenting education and any other recommended programs; be actively present for all family team meetings, court hearings, and visits as they pertain to his children; complete a substance abuse assessment through a DCFS-approved provider and follow all recommendations set forth by the provider; and participate in domestic violence counseling with The Haven to help him with any trauma from the domestic violence in the home and follow through with the recommendations made by The Haven.

Louisiana Children's Code article 1036(C) governs proof of a parent's lack of compliance with a case plan:

C. In accordance with Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8) (a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

Leteya Scott, DCFS's Child Welfare Supervisor, testified that she has been the supervisor for N.J., Sr. and M.C.'s family since the case began and is familiar with the specifics of the case. According to Ms. Scott, both N.J., Sr. and M.C. have been given the opportunity to complete case plans in order to facilitate a successful reunification with their children, but have not done so. M.C. was incarcerated most of the time that the children were in DCFS custody, and N.J., Sr. had ample time to do the things required for the return of his children, but failed to do so. According to Ms. Scott, DCFS attempted to contact N.J., Sr. to discuss his case plan and what

19

he needed to complete, but his responses were "sporadic" and generally only occurred when it was time for a court date.

Ms. Scott testified that N.J., Sr. and M.C.'s case plans required them to have safe and stable housing for the children. According to Ms. Scott, N.J., Sr. and M.C. had "a couple of different addresses" throughout the case, and although DCFS was scheduled to go out to N.J., Sr.'s latest home for a walk-through shortly before the trial, N.J., Sr. did not show up at their appointment time. She testified that when N.J., Sr. had pushed back his arrival time several times and still had not arrived an hour and a half after their scheduled appointment time, she decided to drive out to the home to check out the location; however, she left after sitting outside the house for a few minutes due to safety concerns because the neighborhood in which N.J., Sr. was living was "unsavory."

Ms. Scott testified that M.C. did not make any of the required financial contributions for her children's care to DCFS in the period of time that she was not incarcerated. Ms. Scott acknowledged that M.C. completed a domestic violence course, an anger management course, parenting education, and substance abuse treatment while incarcerated. However, M.C. was dismissed from the required batterers' intervention program for noncompliance and opted out of recommended treatment for substance abuse. N.J., Sr. was referred to several providers for the assessments and classes required by his case plan, but he did not follow through with them. Ms. Scott testified that N.J., Sr. visited the children consistently when M.C. was out of jail, but when M.C. was incarcerated, his visits became very sporadic. Although DCFS reached out to N.J., Sr. on a number of occasions to set up visits, he either did not respond or, if he did, something frequently came up and he did not attend the visit.

M.C. testified at trial that she initially learned that her children had been removed from the Labadieville home and placed in DCFS custody in June of 2022

while she was incarcerated. A DCFS investigator reached out to M.C. at that time and told her that N.J., Jr. and N.J. "were in custody because they didn't have adequate housing." M.C. testified that she was told what she needed to do in order for the children to return home, including securing adequate housing, making financial contributions of $25.00 per month for the children, and completing a parenting course, a domestic violence course, a substance abuse assessment, and a mental health assessment. M.C. further testified that her rights had been terminated to three of her other children in the past due to her failure to work her case plan.

Despite her awareness that inadequate housing was a reason the children were in DCFS custody, M.C. testified that securing and maintaining stable housing was one of the only items in her case plan that she had not completed. She admitted that following her release from incarceration in February of 2023, she lived in a tent for a "couple of weeks." She claimed that she later secured stable housing when she and N.J., Sr. leased a trailer together, but it was never inspected by DCFS before she went back to jail in October of 2023. M.C. remained incarcerated at the time of the October 30, 2024 termination trial; however, she testified that she had already arranged for housing upon her release at a transitional housing center in Houma, where she and the children could stay rent-free for six months.

In addition to housing, M.C. admitted that she had not made the financial contributions to her children's care and support required by her case plan. M.C. testified that she was told by a DCFS caseworker that she could provide items that the children needed in lieu of a cash contribution, so she and N.J., Sr. bought "diapers and clothes" for the children. M.C. did not say how often they bought items for the children or the value of the items. In addition, M.C. alleged that she tried to maintain stable employment for the time period she was not incarcerated so that she could pay child support, but she was unsuccessful and did not pay every month.

M.C. admitted that she had used illegal drugs in the past, but testified that she had completed the required substance abuse assessment and was not identified as having a substance abuse problem. She testified that "I used marijuana before I came to jail this time, but it's been a couple of years since I used meth." M.C. also testified that she had completed the required mental health assessment, and no needs were identified.

M.C. testified that she knows where her children are currently living, but she has not seen them in over a year due to her incarceration. She testified that she calls and talks to N.J., Jr. and N.J. at least once a week, and although she also calls A.J.'s foster mother to talk to A.J., she has not been able to reach her lately.

N.J., Sr. testified at trial about his efforts to comply with his case plan. Although he admitted that he had not maintained stable housing since the children had been in DCFS custody, he testified that he had recently secured stable housing. At the time of the trial, he had been living in a three bedroom, two bathroom house in New Iberia for about five months, and he testified that he wants to buy the house in the future. According to N.J., Sr., he attempted to make the home available for DCFS to inspect the week before trial, but he worked late on the date of the scheduled inspection and could not make it home before Ms. Scott left. N.J., Sr. testified that prior to moving into his current home in New Iberia, he lived in Thibodaux at an address he could not recall for "three or four months," at the house in Thibodaux where DCFS removed A.J. from his custody for "[a]bout five months," and at the house in Labadieville where DCFS removed N.J., Jr. and N.J. from his custody for a year and seven months. According to N.J., Sr., he has provided some financial support for the children when he was employed. Although he could not provide any documentation of the alleged payments, he testified that he was "pretty sure" child support was automatically deducted from his paychecks, and he "had a $2-thousand tax check that the IRS took and paid the state to catch up on back child

22

support." In addition to child support payments, N.J., Sr. claimed that he had purchased some things for the children, such as diapers and clothes. N.J., Sr. testified that he tried to work with DCFS on the required services and classes for his case plan, but he was not always successful because he works long hours "this time of year" and DCFS did not always provide transportation when he needed it.[11] N.J., Sr. testified that he had completed "a few different assessments" for his case plan, but he claimed that he could not provide documentation of this completion because the service providers would not release any records to him. N.J., Sr. further claimed that he participated in random drug screens, which he was told he passed, but that DCFS reported that he failed the drug screens. N.J., Sr. testified that he completed seven out of eight parenting classes, but was dropped from the classes. According to N.J., Sr., he did not complete a domestic violence course because he could not find an available course for male victims of domestic violence. N.J., Sr. testified that "for the longest time" he had "regular visitation" with the children, but he missed some visits due to transportation issues. He also tried to text and check up on the children every few days, but he had some difficulty getting in touch with A.J.'s foster mother.

Although N.J., Sr. and M.C. took some minor actions required by their case plans, they failed to follow through with most things and failed to address the major obstacle to reunification, i.e., the lack of safe and stable housing. After a thorough review of the evidence presented, we cannot say that the trial court erred in finding that DCFS proved by clear and convincing evidence that N.J., Sr. and M.C. failed to comply with their case plans.

---

[11] N.J., Sr. testified that he lost his license some time around December of 2022 due to "[i]ssues with child support and a seat belt ticket," and although he had his license back by the time of trial, he no longer had a vehicle. Despite this, he maintained that he would find a way to get the children where they needed to go if they were returned to him, and he planned to get another vehicle within the next month.

*Reasonable Expectation of Significant Improvement in the Near Future*

In their next assignment of error, N.J., Sr. and M.C. argue that DCFS failed to prove by clear and convincing evidence that there was no reasonable expectation of significant improvement in their conduct in the near future.

Louisiana Children's Code article 1036(D) provides that the lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

In this case, considering the evidence presented of M.C.'s repeated incarcerations, the parties' past failure to work case plans to attempt reunification with their other children, and the parties' failure to make progress with their case plans in the more than two years that N.J., Jr., N.J., and A.J. were in state custody, we cannot say that the trial court erred in concluding that there is no reasonable expectation of significant improvement in the near future. This assignment of error has no merit.

*Abandonment based on failure to provide significant financial contributions*

*for more than six consecutive months*

In their next assignment of error, N.J., Sr. and M.C. argue that the trial court erred in finding that DCFS proved by clear and convincing evidence that their failure

to provide parental contributions was not based on poverty or DCFS's failure to offer reasonable services to them.

At the termination hearing, Ms. Scott testified that N.J., Sr. and M.C.'s case plans required each to make financial contributions for the children. Ms. Scott testified that during the time that M.C. was not incarcerated (between February 2023 and October 2023), she did not make any financial contributions for her children. Further, DCFS records state that N.J., Sr. had not made any required parental contributions as of June 2023, and his case was referred to the Office of Child Support.

M.C. admitted that she did not make any financial contributions to the children's care, although she was aware that her case plan required her to make $25.00 monthly financial contributions.[12] M.C. explained that "a caseworker" told her that if she provided "diapers and clothes or whatever they needed that it would cover our twenty-five dollars," so instead of financial contributions, "we gave diapers and clothes." M.C. did not testify as to the value of the items she provided or the frequency of her alleged contributions, nor did she provide any documentation of the in-kind contributions. M.C. further testified at trial that she paid child support when she was not incarcerated, although she admitted that she did not pay it every month, and she did not have any documentation of any alleged payments.

N.J., Sr. testified at trial that when the children came into care, he did not make the financial contributions required by his case plan because "we had gave [sic] diapers, clothes, [etc.], I believe. I had paid for a few things for the children." Like M.C., he did not testify as to the frequency of the purchases or the value of the items purchased, nor did he offer any documentation of the alleged in-kind contributions. Because he believed he was satisfying the financial contribution

---

[12] At trial, M.C. could not recall whether her case plan required her to make monthly contributions of $25.00 per child or $25.00 total.

requirement of his case plan by buying diapers and clothes, he testified that he was surprised when he received a subpoena for child support enforcement. N.J., Sr. alleged that he has paid child support weekly, by way of automatic payroll deductions, in the last four months that he has been employed. He further testified that he "had a [$2,000.00] tax check that the IRS took and paid the state to catch up on back child support." N.J., Sr. could not provide any documentation of the child support payments he claimed were made, but he testified that DCFS should have all of that information.

Based on the record before us, to the extent that the trial court found that N.J., Sr. and M.C. failed to provide significant contributions toward the children's care from the time the children were taken into custody until the time the petition for termination was filed, such a finding was not manifestly erroneous or clearly wrong.

To prove abandonment on the basis of failing to provide significant contributions to the children's care and support, DCFS need not prove that the parent voluntarily placed the children in state custody. Rather, abandonment may be proven by establishing that the parent left the children under circumstances demonstrating an intention to permanently avoid parental responsibility by failing to provide significant contributions to the children's care and support for any consecutive six-month period. *State in Interest of A.B.*, 2023-0655, p. 10 (La.App. 1 Cir. 1/19/24), 383 So.3d 933, 940, *writ denied*, 2024-00221 (La. 3/7/24), 380 So.3d 552. Under the plain language of La. Ch.C. art. 1015(4)(b), the intent to permanently avoid parental responsibility is demonstrated by the parent's failure to provide significant contributions to the child's care and support for any period of six consecutive months. See *State in Interest of H.R.*, 2021-1328, p. 10 (La.App. 1 Cir. 2/25/22), 341 So.3d 592, 599. Here, DCFS showed that N.J., Sr. and M.C. made no significant contributions for their children's care and support for a period in excess of six consecutive months. Although N.J., Sr. and M.C. made vague, unsupported

26

claims that they made some contributions, both in-kind and financial, the trial court clearly did not find this testimony to be credible or the alleged contributions "significant." Thus, the record supports a finding that DCFS proved the statutory ground of abandonment by clear and convincing evidence. See La. Ch.C. art. 1015(4)(b).

Even so, N.J., Sr. and M.C. argue that termination pursuant to La. Ch.C. art. 1015(4)(b) was erroneous because DCFS did not prove by clear and convincing evidence that their failure to provide significant contributions to the children's care and support was not "due to poverty and financial strain caused by case plan compliance." In support of this argument, N.J., Sr. and M.C. cite *State ex rel. A.T.*, 2006-0501, p. 10, n.7 (La. 7/6/06), 936 So.2d 79, 86, n.7[13] and *State in Interest of M.S.*, 2019-5, p. 13 (La.App. 3 Cir. 7/17/19), 279 So.3d 956, 965, for the proposition that a lack of support caused by poverty cannot be the sole basis for termination of parental rights, there must be willful neglect in the failure of a parent to support his or her children. Although the law recognizes certain affirmative defenses to termination of parental rights based upon abandonment under La. Ch.C. 1015(4)(b), the burden of proof on any such affirmative defense is on the parents. See La. Ch.C. art. 1035(B) ("The parent asserting a mental or physical disability as an affirmative defense to abandonment pursuant to Article 1015(4) bears the burden of proof by a preponderance of the evidence."). N.J., Sr. and M.C. do not allege that a mental or physical disability prevented them from providing financial support for the children; rather, they argue that "they attempted to or did work," and that "they did pay or

---

[13] In *State ex rel. A.T.*, the supreme court noted that although the mother failed to provide support for her children for a period of more than six consecutive months, this period of non-support was during a time in which she was in "personal turmoil" due to the breakup of her marriage, eviction from her home, and her lack of transportation. The supreme court concluded that the fact that the mother later obtained consistent employment and paid child support during the time that she was employed negates the finding that the State proved by clear and convincing evidence an intent to abandon her children by virtue of her six months of non-support. *State ex rel. A.T.*, 2006-0501 at p. 10, n.7, 936 So.2d 79, 85, n.7.

attempt to pay support." A parent alleging lack of employment as just cause for his or her failure to pay child support must show not only that he or she was unemployed, but that he or she was unemployable. *State in Interest of T.L.*, 2021-0728, p. 9 (La.App. 1 Cir. 12/22/21), 340 So.3d 4, 10-11, *writ denied*, 2022-00170 (La. 3/2/22). There is no evidence that N.J., Sr. and M.C. were unemployable; in fact, both N.J., Sr. and M.C. testified that they were employed at various times while the children were in the custody of DCFS. Although M.C. was incarcerated during much of the time that the children were in the custody of DCFS, incarceration is not a defense for the failure to support or maintain contact with one's children in a termination of parental rights case because incarceration results from one's own actions. *State in Interest of S.D.*, 53,575, p. 8 (La.App. 2 Cir. 5/20/20), 297 So.3d 1075, 1080. Further, M.C. admitted that she did not maintain stable employment during the time that she was not incarcerated, and Ms. Scott testified that M.C. failed to provide financial support for the children for at least six consecutive months while she was *not* incarcerated. Furthermore, there is no indication that either N.J., Sr. or M.C. asked for a reduction in the amount of the required monthly payments during these proceedings, despite DCFS's consistent reports that they were noncompliant with that component of the case plan. See *State in Interest of H.R.*, 2021-1328 at pp. 11-12, 341 So.3d at 599. This assignment of error is without merit.

*Best Interests of the Children*

In their final assignment of error, N.J., Sr. and M.C. argue that the trial court erred in finding that DCFS proved by clear and convincing evidence that termination was in the children's best interests.

Ms. Scott testified at trial that the children have done very well in their foster placements. N.J., Jr. and N.J. are with the same foster family and have been there the majority of the time that they have been in DCFS custody. Ms. Scott testified that there were some concerns about developmental delays and behavior when N.J.,

28

Jr. and N.J. first came into DCFS custody, but they have made great improvement since the foster parents have been working with them. She testified that A.J. is also doing well with her foster family. Although she is placed with a different foster family than N.J., Jr. and N.J., the foster parents ensure that the children all see each other, and the children have a great relationship. Ms. Scott believed that being freed for adoption was in the children's best interests.

N.J., Sr. and M.C. both acknowledged that the children are doing well with their foster families, although they were opposed to the children being adopted. N.J., Sr. testified that if he could not have the children back, he would prefer for them to live with his sister.

Considering the testimony presented at trial, we find no manifest error in the trial court's finding that clear and convincing evidence exists to support the conclusion that terminating N.J., Sr. and M.C.'s parental rights is in the children's best interests.

## CONCLUSION

For the reasons set forth herein, the November 29, 2024 trial court judgment terminating the parental rights of N.J., Sr. and M.C. to N.J., Jr., N.J., and A.J. and certifying the children for adoption is affirmed. Costs of this appeal are assessed to N.J., Sr. and M.C.

**AFFIRMED.**